### GOODHUE et al. v. McCLARTY.

Defendant consigned tobacco to his factors in New Orleans, with directions to forward it to G. in Liverpool, and to send the bill of lading to M., defendant's agent in New York, and to draw on M. for the expenses and for a certain sum to be placed to defendant's credit. A few days after, defendant wrote to G., advising him that he had shipped the tobacco to his factors in New Orleans, to be reshipped to him, and of his having drawn on him, in favor M., for a certain sum. Two days after defendant wrote, plaintiffs attached the tobacco in New Orleans. Defendant's draft was forwarded to M., and with it a duplicate of the bill of lading under which the tobacco was consigned to defendant's factors in New Orleans. The draft was negociated by M., and carried to the credit of the defendant, in payment of whose drafts a portion of the proceeds was disbursed. The draft was subsequently accepted and paid by G. When M. heard of the attachment he remitted the balance of the proceeds of the draft to G., who intervened in the action, claiming the portion of the bill not covered by the remittance from M., with commissions and interest. Plaintiffs appealed from a judgment ordering the claim of the intervenor to be paid by preference to their attachment. Held, that no possession of the property rested in M. or G., by the transmission and receipt of the duplicate bill of lading, it having been made in favor of defendant's factors, neither M. nor G. being named in it; that the object of defendants in transmitting it, was, to fortify his representation that he had shipped to his factors, with orders to reship to G.; that, in accepting the draft, G. acted on the faith of defendant's reresentations and promise that the tobacco should go forward, and not upon any possession, for there was none; that defendant never lost, in a legal sense, his control over the tobacco, either as to his creditors or third persons, the consignees in New Orleans being his agents, and their possessions his, they never having been the agents of the intervenor; that, at the date of the attachment, the intervenor had acquired no constructive possession nor privilege; and that the tobacco was subject to plaintiffs' attachment. Aliter, had the consignees in New Orleans written to G. or M., and advised them of the receipt of the orders, and of their intention to fulfill them, and the parties had acted on such advice, or, perhaps, had the consignees known that the draft on G., had gone forward : for an agent is not chargeable for a breach of orders, if his compliance would have been a fraud upon others.

APPEAL from the Fourth District Court of New Orleans, *Watts*, J. *Bradford*, for the plaintiffs, appellants. *Benjamin* and *Micou*, for the intervenors. *Mott*, for the garnishees, who also appealed. The judgment of the court was pronounced by

SLIDELL, J. The plaintiffs are appellants from that portion of the judgment of the Commercial Court which awarded the sum of $1220 37, with legal interest from the 2nd June, 1845, to be paid to *John Gilliat & Co..* intervenors, out of the proceeds of the property attached in this case. The plaintiffs levied their attachment on the 7th April, 1843, on a quantity of tobacco in the hands of *Messrs. Hewitt, Heran & Co.* of this city, consigned to them by the defendant, *Samuel McClarty*. The tobacco was shipped on 31st March, 1843, at Clover Port, Kentucky, on the steamboat Somerville, and consigned to *Hewitt, Heran & Co.* The instructions of *McClarty* to *Messrs. Hewitt, Heran & Co.* were, to forward the tobacco to *W. H. Gilliat* of Liverpool, and to send the bill of lading to *R. L. Maitland & Co.* of New York, who were the agents of *McClarty* there, and on whom his agents in New Orleans were directed to draw for the expenses in New Orleans, and for the further sum of $300, to be placed to the credit of *McClarty* in account. In the postscript of the letter, *McClarty* says: "In drawing on *Messrs. Maitland & Co.* for the $300, please

do it at sixty day's sight. Your bill will be provided for out of our sterling ex-   GOODHUE
change, sold by *Messrs. Maitland & Co.*" On the 5th April, 1843, (which            *v.*
was five days after the shipment of the tobacco, and two days before its attach-    McCLARTY.
ment in New Orleans,) *McClarty* wrote to *John Gilliat & Co.* of London,
advising them that he had shipped the tobacco to New Orleans, to be reshipped
to their address, and also of his draft in favor of *Maitland & Co.*, for £532.
The draft was forwarded to *Maitland & Co.*, to be negotiated for account of *Mc
Clarty*. A duplicate of the river bill of lading, under which the tobacco was
consigned to *Hewitt, Heran & Co.*, was also sent to *Maitland & Co.* On this
bill of lading was endorsed a memorandum, that the tobacco was to be forward-
ed to *John Gilliat & Co.*, of London; but it does not appear by whom, nor at
what time, this memorandum was put on the bill. It exhibited this memoran-
dum when received by *Maitland & Co.*; but the memorandum was in a different
hand writing from that in which the bill was filled up. It was probably put there
by *McClarty*, as a direction to *Maitland & Co.* to send it to *Gilliat & Co.* On
the 19th April, 1843, *Maitland & Co.* addressed a letter to *John Gilliat & Co.*,
in which they say : " When bill of lading is received from New Orleans, it
shall be duly forwarded. We crave your protection for *McClarty's* bill, against
the shipment, for £532, which we *shall negotiate.*" The bill was subsequently
negotiated by *Maitland & Co.*, and the proceeds carried by them to the credit of
*McClarty*. The bill was accepted by *John Gilliat & Co.*, on the 30th May, 1843,
and paid in due course. *Maitland & Co.* disbursed a portion of the proceeds of
the bill, in payment of the drafts of *McClarty*, till they heard of the attachment
of the tobacco in New Orleans, when they refused to honor any further drafts
from him, but remitted the balance in their hands, amounting to £316, 14, 8, to
*John Gilliat & Co.* For the portion of the bill not covered by these remittances,
with commission and interest, *John Gilliat & Co.* have intervened. .

The following points are made by the interveners :  " 1st. That the bill was
endorsed and accepted upon the faith of the bills of lading from Louisville to
New Orleans; and that the possession of the bills of lading, was possession of
the goods. 2nd. That *Hewitt, Heran & Co.*, consignees in New Orleans, hav-
ing received the tobacco, with instructions to ship to Liverpool, and *with notice
of the interest of the intervenors*, became, by accepting the consignment, agents
of the intervenors ; and their possession must be considered the possession of
the intervenors. 3rd. That from the moment of enclosing the bills of lading
to New York, and drawing the bills against them, the control of the defendant
over the merchandise ceased, and the same was no longer liable to be attached
for his debts."

It is quite clear that no possession of the goods vested in *Maitland & Co.* or
*Gilliatt & Co.*, by the transmission and receipt of the duplicate bill of lading.
That bill of lading was in favor of *Hewitt, Heran & Co.* Neither *Maitland & Co.*
nor *Gilliatt & Co.* were named in it. The object of *McClarty* in transmitting
it was, not to vest any possession in *Maitland & Co.*, but simply to fortify his
representation that he had made a shipment to *Hewitt, Heran & Co.* with orders
to re-ship to *Gilliatt*. It is in vain to suppose that either *Maitland & Co.* or
*Gilliatt & Co.* viewed the matter in any other light. They knew that *Hewitt,
Heran & Co.* would take possession of the goods on their arrival at New Orleans,
being the parties clothed under the bill of lading with the legal ownership. In
accepting the bill of exchange the intervenors acted on the faith of *McClarty's*
representation and promise that the tobacco should go forward, and not upon

8

GOODHUE
v.
McCLARTY.

any possession, for in law there was none. Nor can McClarty be considered as having lost, in a legal sense, his control over the property. In a moral sense, his control was gone, because it would have been a fraud on his part to have diverted the shipment. But in law, he was still the master, so far as concerned his creditors or third persons. Hewitt, Heran & Co. were his agents, and their possession was his.

Hewitt, Heran & Co. cannot be considered as the agents of the intervenors, and holding for them. They were the mere factors and agents of McClarty. The letter of advice may pehaps be considered as informing them that, at that time, McClarty intended to draw on England against this merchandise. But suppose the next day he had countermanded his orders, and said to Hewitt, Heran & Co.: I have changed my mind, I prefer to sell in New Orleans—sell and send me the proceeds? We are of opinion that Hewitt, Heran & Co. would have been bound to obey his orders. Again, suppose that, on the 7th April, 1843, instead of the sheriff with a writ of attachment, McClarty had presented himself at Hewitt, Heran & Co's. counting house, and had said : I will take charge of the tobacco myself—here is the amount of your claims for freight, &c.? Hewitt, Heran & Co. would clearly have been bound to give up the property to him, and there would have been no bad faith on thir part in doing so. This is the view of their position and duty, which Heran has stated in his examination as a witness, and we think it not only a practical but a legal one. They were McClarty's agents only, and knew, and were bound to, no one else: The case would have been very different if they had written to Gilliat & Co. or Maitland & Co., and advised them of the receipt of the orders and their intention to fulfil them, and the parties had acted on such advice. Perhaps too it would have been their duty to hold on, and they would not have been liable in damage to McClarty in doing so and refusing to recognise his control, if they had known, in the case supposed, that the draft on Gilliat & Co. based on this merchandise had gone forward ; for it is a principle of the law of agency, that the agent is not chargeable for a breach of orders, if his compliance would have been a fraud upon others.

Upon a careful consideration of this case we are of opinion that, at the date of the attachment, no constructive possession had been acquired by the intervenors, nor any privilege ; nor had any thing occurred which created on the part of Hewitt, Heran & Co. an implied obligation to hold the property for their benefit, and divested the control of McClarty. The property therefore was subject to the plaintiffs' attachment.

So far as the judgment of the court below affects the garnishees, it appears to us to have been irregularly rendered. There was no traverse of the answers of the garnishees, nor was the case heard as to their rights. The case appears to have been tried only as between the plaintiffs, the defendants and the intervenors. The action of the court as to the garnishees was without a contestatio litis or notice of trial, and was premature. As the case is presented, we have not the means of doing justice between the garnishees and those opposed to them in interest, and shall remand the cause for further proceedings.

It is therefore decreed that so much of the judgment of the court below as sustains the intervention of John Gilliatt & Co. be reversed, and that said intervention be dismissed at the cost of the intervenors. It is further decreed that the judgment of the court below, so far as it affects the rights of the garnishees Hewitt, Heran & Co. be reversed, and the cause as to the said garnishees be remanded for further proceedings according to law. And it is further decreed that the judgment of the court below, except so far as above set forth, be affirmed ; one half of the costs of the appeal to be paid by the said John Gilliatt & Co. and the other half by the plaintiffs.