(50 South. 855.)

No. 17,604.

GRIGSBY CONST. CO. v. COLLY (HAMILTON et al., Interveners).

(Dec. 13, 1909. On Application for Rehearing, Jan. 3, 1910.)

1. ACCOUNT, ACTION ON (§ 7*)—EVIDENCE.

Amount claimed, balance on open account, is due plaintiff.

[Ed. Note.—For other cases, see Account, Action on, Dec. Dig. § 7.*]

2. ATTACHMENT (§ 63*)—OWNERSHIP OF PROPERTY—TRANSFER.

The writ of attachment took nothing. It was not proven that the property attached belonged to defendant.

[Ed. Note.—For other cases, see Attachment, Dec. Dig. § 63.*]

3. PRINCIPAL AND AGENT (§ 101*)—CONTRACTS—ALTERATION—AUTHORITY OF AGENT.

The reconventional demand of defendant was not sustained by sufficient testimony. He failed in the attempt at proving that his contract with the company was changed. The alleged agent, by whom it was stated that the change in contract was made, was not the agent of plaintiff.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 101.*]

4. FRAUDULENT CONVEYANCES (§ 299*)—TRANSFER OF PERSONAL PROPERTY—SALES.

The testimony did not satisfy the court that the property seized was defendant's.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Dec. Dig. § 299.*]

5. DETERMINATION OF CAUSE ON APPEAL.

Judgment on main demand—open account—affirmed.

Judgment annulled as relates to reconventional demand.

Affirmed as relates to interveners.

(Syllabus by the Court.)

6. ATTACHMENT (§ 30*)—GROUNDS.

Where defendant, a railroad subcontractor largely indebted to plaintiff, was on the eve of his departure for Texas, where he proposed to reside permanently, having practically completed his work for plaintiff and started to work for another company, promising to pay his indebtedness, which promises he failed to keep, and had stated to plaintiff's manager that he was going to take his outfit to Texas on a rice farm, there were sufficient grounds for attachment.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. § 80; Dec. Dig. § 30.*]

Monroe and Provosty, JJ., dissenting.

Appeal from Twelfth Judicial District Court, Parish of Vernon; Don E. So Relle, Judge.

Action by Grigsby Construction Company against A. C. Colly, in which A. Hamilton and another intervened. From a judgment in favor of defendant on a demand in reconvention and dissolving plaintiff's attachment, and in favor of interveners, plaintiff appeals. Judgment in favor of defendants in reconvention and against plaintiff reversed, and judgment dissolving the attachment and in favor of interveners affirmed.

C. Evans Hardin and James R. Monk, for appellant. J. W. Baker, for intervening appellees.

BREAUX, C. J. The Grigsby Construction Company sued the defendant, A. C. Colly for $3,191.50, with interest.

The following is the itemized account upon which the suit is based:

| | |
|---|---|
| To amount carried forward........ | $15,027 24 |
| Credits by final estimates rendered by engineer on J. & E. Railway on secs. 57 & 58 as follows: | |
| 30.100 yds. of earth at 17 per cu. yd. 2.7 acres grubbing at $100 per acre | 270 00 |
| By final estimate on secs. 67, 68, 69, 38,352 cu. yds. of earth at .15 per cu. yd........................ | 5.742 80 |
| 7.34 acres grubbing at 75 per acre.. | 550 50 |
| By refund of freight of G. C. & F. on outfit from Fort Worth to De Ridder ......................... | 155 00 |
| Balance due G. C. Co......... $ | 3,191 50 |

Interest to be added from June 2, 1907.

Plaintiff sued out a writ of attachment and averred grounds provided in the Code of Practice.

Defendant denied all indebtedness to plaintiff. He furthermore reconvened, claiming that, instead of his being indebted to plaintiff, plaintiff is indebted to him in the sum of $7,525, instead of the $5,742.80 allowed for labor upon sections 57 and 58 on the J. & E. Railway, at the rate of 25 cents per cubic yard; the amount of earth removed being, as defendant alleges 30,100 cubic yards.

Defendant avers that by contract with plaintiff he became its employé under the promise and agreement that he was to be paid a reasonable amount for his work in sections 57 and 58. The defendant also averred, as stated before: That the mileage work in these sections performed by him for plaintiff is worth 25 cents per cubic yard. That plaintiff agreed with him to transport his outfit, from a point named in Arkansas to De Ridder, Calcasieu, to be used in construction work by him, free of charge; that for this he was allowed a credit of $150.44 when he was entitled to a credit of $875.07. He objects also to a small item of $4, which he says should not have been charged to his account.

From these data, defendant deduces that the plaintiff company is indebted to him in the sum of $1,867.23, instead of his being indebted to plaintiff in the sum which plaintiff claims, and for this balance he asks for judgment in his reconventional demand.

A. Hamilton intervened in the suit and claimed a part of the outfit attached, and seized as his own; alleged that he obtained it from defendant for a valuable consideration on the 21st day of March, 1907, prior to the date of the seizure under the writ of attachment. He asked for judgment recognizing him as owner and asked to have his right reserved to damages in a separate suit.

To this suit in intervention, the plaintiff company filed an answer averring that the intervener is not the owner of the property; that the written title which intervener sets out is a mere simulation for the purpose of defrauding it from recovering the amount due as before stated.

J. A. Hamilton, another intervener, claimed part of the property attached. He also asked for judgment recognizing him as owner.

Plaintiff answered this intervention also on about the same grounds as the answer to the intervention of A. Hamilton, the first intervener.

The court rendered judgment against plaintiff rejecting its demand and for defendant for the sum claimed by him in his reconventional demand.

The court dissolved the writ of attachment and recognized title of interveners to the property.

### Writ of Attachment.

The right vel non of the plaintiff to an attachment is the first question that presents itself.

As against the defendant, there was a prima facie showing for an attachment. The defendant was on the eve of his departure for Texas, where he proposed to reside permanently. The facts and circumstances

sustain the plaintiff's allegations in so far as the defendant is concerned.

The manager of plaintiff company testified that defendant had practically completed his work for plaintiff and had gone to work for another company, promising to pay, promises which he failed to keep. Defendant furthermore told him that he was going to take his outfit to Texas on a rice farm.

To another witness defendant said that he was on his way to Beaumont to engage in rice farming.

The attempt made at rebutting this testimony does not amount to a rebuttal of the prima facie showing made for an attachment.

We reiterate, as relates to defendant, tnere was ground sufficient for an attachment. In the nature of things it cannot extend further than the defendant and his property, if any he has.

Of this later.

Defendant virtually admitted the correctness of plaintiff's account inserted above, except a small item of $4.

The questions involved are questions of fact and require for decision an analysis of the testimony.

The first witness was the manager of the Grigsby Construction Company by whom the contract for construction and grading and road was let to defendant some time in June, 1906. He refers particularly to contract work in sections 68 and 69 at 15 cents per cubic yard, and states that it was really more than it was worth.

With reference to the claim of defendant for transportation over railways of defendant's outfit from where it was in Arkansas to De Ridder, he said that there was no agreement to transport this freight over the Gulf, Colorado & Santa Fé, on which he allowed defendant free transportation in accordance with agreement. The defendant had paid the amount. It was refunded to him as set out in the statement above.

Another difference between plaintiff and defendant is about the change of the profile work. There were two of these profiles, one P. 1, and the other P. 2.

Defendant's contention is that P. 2 was substituted for the first, and that the work was done under P. 2, much to his disadvantage, and that when he discovered the change in the profiles he objected and said he would not do the work under the second profile.

The manager of plaintiff company testified that there was no material difference between the two profiles. He stated that the defendant made no complaint until the work was about completed.

The defendant differs very much from the manager upon that subject. He says that after he had objected an agent of the plaintiff, known as a "line rider," directed him to take up the work and complete it; that he would be paid, not the 15 cents per cubic yard, but the value of the work.

This refers particularly to sections 57 and 58.

The manager of the plaintiff company testified, in answer to that contention of the defendant, that it was not customary with the Grigsby Construction Company, or any other company well managed, to make a contract with a subcontractor and stipulate that he will be paid a reasonable amount for his work.

This manager says that the defendant never informed him that it was his intention to make such a claim; that they thought all along that he was working for 15 cents per cubic yard. He testified that the man known as the "line rider," John Connerly, had no authority whatever to enter into any such contract and change the price from 15 cents per cubic yard to 20 cents.

The superintendent of the plaintiff company next testified. He in the main corroborates

the manager. He says with reference to sections 57 and 58 that about the time defendant finished his work in sections 67 and 68 he offered to let him do the work at the Cravens Yards, which he desired to complete, at 17 cents per cubic yard, the same price that the plaintiff company was getting from the Gulf, Colorado & Santa Fé, its contractee, and that he was to receive $100 per acre for doing "grubbing" work instead of $75.

With reference to the other work, he states that it was well paid at 15 cents per cubic yard.

The father of the superintendent as a witness corroborates the son. He was present at some of the conversation held and testified about to the same effect as his son.

Another witness was a merchant by the name of Martin, who testified about expressions of defendant in regard to the necessity of taking advantage in order to protect one's self when working for railroad companies.

There is no necessity of dwelling further upon the evidence of plaintiff's witnesses. They in the main sustain its demand.

The defendant was the first witness to testify in his own behalf. He specially referred to his agreement with Connerly. His evidence is in conflict with that of the manager and the superintendent. Taking it all in all, after careful consideration, we arrive at the conclusion that it could not serve as a basis for judgment for the amount which he claims.

He, we presume, is an active man; possibly devoted to his work, but wanting in power of observing closely.

He testified that there was what is known as "hard pan" and other elements in the earth.

Other witnesses have testified that there was no hard pan about it; only earth to be removed.

Contractors who employ subcontractors do not stipulate to pay for value of the work.

The defendant in making such a claim is not sustained by custom, and he is not sustained by the weight of the testimony of the case.

Defendant himself had worked in constructing railroad beds for some nine years, never without stipulated price.

He did not know with any degree of accuracy what was meant by roadbed measure, and when he was informed that it meant the actual earth taken out of the cuts and the actual earth put in the fills, whether the same earth is put in the fills that is taken out of the cuts or not, his reply was that he "could not exactly say."

He may have the knowledge very active men in such work possess and may not have given himself concern about definitions or measurements.

We have not found it possible to give it controlling weight.

Other witnesses do not agree with him in regard to the extent and value of the work. He has not sustained his cause by sufficient evidence.

It will be borne in mind that he was plaintiff in reconvention, and throughout the onus of proof was with him.

Defendant also failed to sustain his claim for free transportation of his outfit from Saline River, in Arkansas, to De Ridder, La. He paid the amount originally and has not made out his claim for reimbursement, on the ground that he was to have free transportation.

The manager at the time wrote to him that he could not get any transportation over any road except the Santa Fé. This allegation is sustained by a letter of the manager to the defendant.

He was provided with free transportation over the Santa Fé; that was the extent of the agreement.

We have arrived at the conclusion that plaintiff has proven the amount claimed in its

petition except $4, and that defendant has not sustained his claim in reconvention.

This brings us to the interventions.

There were two filed; one by J. A. Hamilton, and another by A. Hamilton, alleging themselves as owners of the property seized.

The sale made by defendant to A. Hamilton of a part of the outfit was for $4,000, partly cash and part in an amount which had been previously advanced to defendant. It is dated March 21, 1907.

The writ of attachment was issued on the 20th of June, of the same year.

The sale to J. A. Hamilton was made on the 15th day of December, 1906, for the amount of ———.

Suit was instituted and the attachment levied on June 20, 1907.

Both sales were recorded in the recorder's office in Calcasieu parish, and in the mortgage office in the home county of the interveners in Texas.

One of the interveners is the father-in-law, and the other the son-in-law, of the defendant.

The defendant, while he was at work for the plaintiff, stated to the civil engineer of plaintiff that he was not the owner of the outfit.

The defendant at about the time of these sales, and shortly thereafter, stated that he was about to change his occupation, leave subcontracting and take up the cultivation of rice instead.

He did make the change shortly thereafter.

The interveners testified that the horses and mules and other property they bought were on their farms and were used in making crops since the attachment. Prior to the attachment, they leased the outfit to the defendant.

There is evidence showing that the amount of rent was paid. There were some slight omissions in regard to the payment, which we do not consider of great consequence in the case.

Plaintiffs testified as to their ability to buy the property. Their statement in this respect does not seem to have been questioned at all. They swore that they could find use for the property which they bought.

We infer from the testimony that they are well to do farmers.

While it is true that the defendant in conversation would occasionally speak of the outfit while it was in his possession as his property even after the sale, as he was the lessor of this property he could well use these words without prejudicing the rights of the interveners as owners. Men who have charge of property are prone to use the word "mine," and that is particularly true if they are lessees of the property.

There is no testimony showing that defendant ever at any time stated to the employés of the plaintiff company that he was the owner. On the contrary, in conversation with one of the officers, an engineer who had something to do with directing the work on which defendant, Colly, was engaged as subcontractor, he said to him that he was not the owner of the property.

We infer that the expression "my property" was used in a general way in talking.

The plaintiff advanced supplies to defendant. It could have asked information of the defendant upon the subject of his property and regarding his ability to pay. Nothing of the kind was done.

Besides, there was no certainty at the date the property was sold that defendant would be indebted to the plaintiff at the end of the contract. There was an open account between them. Plaintiff made advances against which defendant was allowed credit for his work. Suddenly, about the end of the contract, plaintiff awoke to the necessity of instituting attachment against property which the testimony shows had been sold.

The fact that these parties are related is not necessarily proof of unfairness or fraud. Relatives may trade among themselves upon legitimate basis.

We have considered the details testified to by witnesses. Taken as a whole, we are of opinion that these sales should not be annulled by us.

The learned judge of the district court saw the witnesses while they were testifying, observed them. Weight must be given to his opinion.

Regarding the reconventional demand, which we have just rejected, it may be thought by defendant that the opinion of the district judge should have equal weight as relates to the amount he claims and which was allowed by the district judge, and that we should allow the amount which he found to be due.

This does not necessarily follow. The matter of the profiles to which we have referred present questions independent of witnesses. So, also, the change from one profile to another. The first contract and then the second contract which defendant claimed was substituted to the first present questions to which we gave special attention. Our opinion was arrived at without reference to the finding heretofore.

To return to these sales for a moment; transactions which end in sales sometimes present nice questions.

In this instance the two sales depend entirely upon facts.

As to part of the case relating to these sales, after reflecting over the testimony, the conclusion reached by us agrees with the opinion of the judge of the district court. We have not been able to agree with him in regard to the reconventional demand.

For reasons stated, it is ordered, adjudged, and decreed that the judgment appealed from is annulled, avoided, and reversed. It is further ordered, adjudged, and decreed that plaintiff recover of defendant, A. C. Colly, judgment for the sum of $3,191.50, less $4 charged in error, with 5 per cent. interest on the balance from judicial demand. It is further ordered, adjudged, and decreed that defendant's demand for $1,800 be rejected. It is further ordered, adjudged, and decreed that plaintiff in intervention A. H. Hamilton have judgment against the Grigsby Construction Company adjudging and decreeing all the property described in his intervention as his. It is further ordered, adjudged, and decreed that the writ of attachment sued out be dissolved and set aside, and that intervener be maintained and quieted in his possession of the property seized in said writ, reserving to the intervener the right to sue for damages if any such right he has.

It is further ordered, adjudged, and decreed that the Grigsby Construction Company as between it and this intervener pay all costs of both courts.

It is further ordered, adjudged, and decreed that plaintiff in intervention A. Hamilton do have and recover judgment against the Grigsby Construction Company adjudging and decreeing all the property described in his petition as belonging to this intervener, that the writ of attachment sued out be dissolved and set aside, and that intervener be maintained and quieted in his possession, reserving to him action for damages, if any right he has.

As between plaintiff and interveners, plaintiff to pay all costs of both courts. On the main demand between plaintiff and defendant, the defendant is condemned to pay costs of both courts.

MONROE and PROVOSTY, JJ., dissent from the judgment in favor of the interveners.

### On Application for Rehearing.

LAND, J. Plaintiff has filed a petition for a rehearing on the ground that the court erred in affirming the judgment in favor of the two interveners. We have carefully reviewed the pleadings and the evidence.

124 LOUISIANA REPORTS.

Each of the interveners has a written title to the property claimed by them, respectively, signed by the defendant, the acknowledged owner at the time, and it is also shown by written evidence that at the date of the attachment the defendant held possession of the property as the lessee of the interveners. The only attack by the plaintiff on these titles in its pleadings is that both were mere simulations, and that no consideration passed between the parties.

Conceding that the continued possession of the vendor creates a prima facie presumption of simulation, this presumption is rebutted by the testimony of the two interveners and of the defendant that the property was actually sold and paid for as stated in the bills of sale, and was actually leased to the defendant for valuable consideration. The character of these three witnesses was not impeached in the court below, and the trial judge gave credit to their sworn statements. The fact that one intervener is the father-in-law, and the other intervener is a brother-in-law, of the defendant, is, at most, a mere suspicious circumstance.

J. A. Hamilton purchased on December 15, 1906, more than six months before this suit was instituted. He testified that he paid for the property, and the defendant testified to the same effect. We find in the record no direct evidence to the contrary.

A. Hamilton, the father-in-law, a rice planter of means residing in the state of Texas, testified that he loaned the defendant $2,900, which was paid to one Reib on account of the purchase price of the property in dispute, and that after the defendant obtained a bill of sale of the same intervener purchased the property, paying an additional sum of $1,100. The record shows a bill of sale of the same 19 head of mules, etc., from the Grigsby Construction Company by C. E. Reib, to the defendant, of date March 2, 1907, for the price of $3,250, the receipt of which is acknowledged. On March 21, 1907, the defendant transferred the same property by bill of sale to the intervener. From what source did the defendant derive the money he paid to the plaintiff company on March 2, 1907, if not from his father-in-law?

We are not prepared to say, on the face of the cold record before us, that the three parties to these bills of sale have testified falsely. In the nature of things, the trial judge, who saw and heard the witnesses, is in a far better position than we are to judge of their credibility.

Rehearing refused.